# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2020

Lyle W. Cayce
Clerk

No. 20-10080

Alfredo Valencia,

*Plaintiff—Appellant*,

*versus*

Cory Davis,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:19-CV-17

Before Owen, *Chief Judge*, and King and Engelhardt, *Circuit Judges*.
Per Curiam:*

Plaintiff-Appellant, Alfredo Valencia, sued defendant-appellee, Officer Cory Davis, pursuant to 42 U.S.C. § 1983. Valencia contends that Davis used excessive force against him in violation of the Fourth Amendment of the U.S. Constitution. The district court granted summary judgment in Davis's favor on the basis of qualified immunity. The court also granted

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

Davis's motion to strike Valencia's expert report evaluating the reasonableness of the force used. Valencia appeals both decisions. We AFFIRM.

## I.

Just before midnight on March 16, 2017, officers of the Abilene Police Department ("APD") were dispatched to a bar fight at the Longbranch Saloon in Abilene, Texas. The 911 call from the location advised that one of the individuals involved in the fight had "said he has a gun." Accordingly, the dispatcher included the code "T32" on the callsheet, which is the "ten-code" for "Subject with a Gun."

Officers who arrived on the scene encountered "a bald, Hispanic male, with blood on his face, wearing no shirt." This individual was later identified as Alfredo Valencia. Valencia got into a tan Tahoe and failed to comply with an officer's order to "stop" before leaving the scene. One officer on the scene, Catherine Mason, voiced information about the fleeing Tahoe over the APD's "PD1" radio channel. She stated "they possibly have ten thirty-two." Mason further stated "just ten-zero"—the code for "Use Caution."

While officers were responding to the call at the Saloon, APD officers Cory Davis, Brandon Scott, and Brady Broyles were working together clearing a nearby business. Officer Scott heard the PD1 dispatch radio alert regarding a fight at the Saloon and Officer Mason's additional report regarding the Tahoe leaving the scene and the possible T32. As Davis was tuned to dispatch channel "PD2" instead of PD1, it was Officer Scott who relayed the information "that there was a call up the street involving a fight and a gun." The officers then saw the reported vehicle traveling at a high rate of speed. The officers got into their patrol cars and pursued the subject vehicle.

No. 20-10080

The subsequent events were captured by the dashcam video recorder in Davis's car. Because of the report of the suspect's "involvement in a fight and possession of a firearm," the officers conducted a "high risk 'felony stop,'" meaning they had their firearms drawn. Officers Davis and Scott were positioned on the driver side of the vehicle, while Officer Broyles was on the passenger side. Davis issued a command for Valencia to "roll your window down." After approximately seventeen seconds, Valencia complied. Officer Scott then commanded, "driver drop the keys out the window." After Valencia extended a single hand holding his keys out the window, Scott repeatedly commanded him to place both hands out the window before Valencia complied. Scott again commanded Valencia to "drop the keys," to which Valencia complied.

Scott next ordered Valencia to open the car door from the outside, to which he initially complied before placing his hands back inside the vehicle and out of the officers' lines of sight. In response, Scott repeatedly commanded Valencia to get his hands out of the vehicle. Scott and Davis both reported that Valencia was making "furtive movements" where his hands could not be seen. In a subsequent affidavit, Valencia stated that, during the stop, he "did not hear [the officer] say to put both hands out of the window and thought [he] had complied by putting the keys out of the window."[1]

Valencia then exited the vehicle while officers continued to command him to raise his hands.[2] Valencia turned around to face the vehicle and placed

---

[1] Valencia did not address his failure to keep both hands outside of the vehicle after complying with the order to drop the keys but merely stated that "I heard the officers tell me to get out of the car, so I opened the car door and got out of the car."

[2] At that point, because of Valencia's failure to follow instructions, Davis warned him to "follow instructions or you'll get bit by a dog." Though it cannot be discerned in the video, Valencia reportedly responded "send that f*ing dog."

his hands on the roof of the car. Valencia was not wearing a shirt but was "wearing blue jean pants with multiple pockets around his waistline." Blood was also visible on his face. One of the officers commanded him to "keep your hands up and back towards me." Valencia later stated that he did not hear this command.

At the same time, Davis reported that he "could hear officer Broyles issuing multiple commands to the passenger of the vehicle"—Valencia's girlfriend, Amanda Camacho. Officer Broyles reportedly ordered the passenger "to not get out of the car." However, the passenger "did not obey [his] commands and suddenly exited the vehicle." Broyles stated that, "[b]ecause of the immediate risk to officer safety involved in this stop, I . . . immediately subdued the passenger when she exited the vehicle in violation of my commands and put her in handcuffs." As Davis later testified, the passenger exiting the vehicle "caused a . . . more dynamic situation for—and unsafe situation for other officers."

The video then clearly shows that Valencia dropped his right hand off the roof of the vehicle and towards his side. Valencia then returned the hand to the roof of the car. The entire sequence took seconds to elapse. Valencia explains that he was "distracted when I heard [Amanda] make a noise, and I lowered my right arm from the roof of the car for a second." Valencia claims that he "never reached for my pocket or my waistline." However, Davis perceived Valencia to "suddenly drop his right hand toward his waistline." Davis then made the "split second determination to holster my firearm . . . and [run] toward [Valencia]."[3] Mere seconds after Valencia dropped his arm,

---

[3] Davis later stated that he believed Valencia "could be reaching for the reported gun concealed somewhere in his pants or around his waistline" and "thought this presented an immediate risk of serious physical harm to my own personal safety and the safety of my colleagues."

No. 20-10080

Davis can be seen sprinting toward him before pinning him against the car. Valencia was then taken to the ground and handcuffed. Officers searched the vehicle and Valencia, but found no firearm.

Valencia later stated that, as a result of the impact, he suffered a dislocated shoulder and a Bankart Labral tear, which required surgery. He further explained that he was "trying my best to follow the instructions they gave me, but it was difficult to hear the officers clearly due to multiple officers yelling at the same time."

On February 4, 2019, Valencia filed suit against Officer Davis pursuant to 42 U.S.C. § 1983, alleging excessive use of force in violation of the Fourth Amendment. Davis filed a motion for summary judgment asserting the defense of qualified immunity on May 24, 2019. In response to exhibits filed with Valencia's response to the motion, Davis filed a Motion to Exclude Expert Testimony and Strike Plaintiff's Expert Witness.

On January 13, 2020, the district court granted Davis's motion for summary judgment and his motion to exclude the expert's testimony. First, the court granted the motion to exclude "for the reasons argued therein and because the expert's testimony is irrelevant to the adjudication of the qualified immunity analysis in light of the comprehensive video footage entered into the record." The court then addressed both the force used to take Valencia to the ground and the force used to pick him up. The court first held that Davis's use of force in subduing Valencia "was not objectively unreasonable or excessive in light of the circumstances known to the officer at that time." The court also rejected Valencia's claims pertaining to the

No. 20-10080

force used to lift him off the ground.[4] The district court thus held that Davis was entitled to qualified immunity.

Valencia now appeals the district court's grant of qualified immunity with regard to his Fourth Amendment claim related to the force used to take him to the ground and the granting of Davis's motion to exclude Valencia's expert witness.

## II.

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 274 (5th Cir. 2015). "We are not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below and supported by the record." *Lincoln v. Scott*, 887 F.3d 190, 195 (5th Cir. 2018).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Lewis v. Sec'y of Public Safety and Corr.*, 870 F.3d 365, 369 n.10 (5th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In addition, where there is video capturing the events in question and

---

[4] In his briefing, Valencia addresses only the district court's decision granting qualified immunity on his excessive force claim regarding the force used to take him to the ground and does not address his other claim regarding the force used to lift him from the ground. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (a party waives an argument that is not adequately briefed on appeal).

No. 20-10080

"opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019) ("We need not accept a plaintiff's version of the facts for purposes of [QI] when it is blatantly contradicted and utterly discredited by video recordings.") (citation omitted).

To establish excessive force in violation of the Fourth Amendment, a plaintiff must demonstrate: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citation omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The evaluation of reasonableness under the Fourth Amendment therefore "requires careful attention to the facts and circumstances of each particular case," including consideration of the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

## III.

On appeal, Valencia argues that the evidence establishes that Davis was not justified in using force because Valencia presented no immediate threat or, alternatively, that genuine issues of material fact precluded the district court's grant of summary judgment. Valencia contends that "the right to be free from this form of excessive force was clearly established."

Valencia also argues that the district court erred in excluding his expert report. We address each argument in turn.

### A. Qualified Immunity

"'A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof,' shifting it to the plaintiff to show that the defense is not available." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)). "The plaintiff must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *King v. Handorf*, 821 F.3d 650, 654 (5th Cir. 2016) (citation omitted).

"[O]fficers are entitled to qualified immunity under [42 U.S.C.] § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). We are permitted to exercise our discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). We exercise that discretion in this case to address step two first.[5]

At step two of the qualified immunity analysis, "[i]t is the plaintiff's burden to find a case in his favor that does not define the law at a 'high level

---

[5] The district court briefly addressed step two of the qualified immunity analysis and found that Valencia had alleged a violation of a clearly established right. For the reasons that follow, we disagree. *See Lincoln*, 887 F.3d at 195 ("We are not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below and supported by the record.").

of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass*, 814 F.3d at 732–33). Rather, "[c]learly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Delaughter v. Woodall*, 909 F.3d 130, 139 (5th Cir. 2018) (citation omitted).

For example, the plaintiff's burden at step two is not satisfied by broadly stating that "citizens are protected against unjustified, excessive police force." *Cass*, 814 F.3d at 732; *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) ("The Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances[,] [i]nstead [of] saying only that the 'right to be free of excessive force' was clearly established."); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.").

In this case, Valencia claims that the law is "clearly established that an officer who immediately resorts to physical force rather than continuing negotiations with a person who is not fleeing, poses no danger, and who is not engaged in active resistance violates an arrestee's constitutional rights." However, the trio of cases that he cites in support of this proposition are easily distinguishable and do not clearly establish a Fourth Amendment violation in this case.

First, in *Bush v. Strain*, we recognized a Fourth Amendment violation for excessive force where the officer "should have known that he could not forcefully slam [the suspect's] face into a vehicle while she was restrained and subdued." 513 F.3d 492, 502 (5th Cir. 2008). By contrast, Valencia had

not been "restrained and subdued" at the time Davis used force. *See, e.g.*, *Robles v. Ciarletta*, 797 F. App'x 821, 826 (5th Cir. 2019) (distinguishing *Bush* because "the determinative fact in *Bush*—that she was already subdued—is absent here"); *Bailey v. Preston*, 702 F. App'x 210, 214 (5th Cir. 2017) (distinguishing *Bush* because no force was used "once [the defendant] was handcuffed").

Second, in *Cooper v. Brown*, we held that "permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." 844 F.3d 517, 524 (5th Cir. 2016). In sharp contrast to the instant matter, the officers in *Cooper* "had no reason to think that [the suspect] posed an immediate threat." *Id.* at 525. In particular, the suspect in *Cooper* was "not suspected of committing a violent offense" and the officer "knew he had no weapon." *Id.* at 522–23. In this case, it cannot be disputed that Davis was aware that Valencia had been involved in a bar fight and had been informed that he was possibly armed. *See Garza*, 943 F.3d at 745 ("[W]e look at the case from the perspective of a reasonable officer on the scene . . . and consider[ ] only the facts that were knowable to the defendant officers at the time.") (citations omitted); *see, e.g.*, *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018) (distinguishing *Cooper* in part because the officer "did not know whether [the suspect] was armed"). Indeed, these facts are entirely consistent with Davis's decision to conduct a "felony stop." Accordingly, *Cooper* does not clearly establish a constitutional violation in this case.

Third, in *Hanks v. Rogers*, we held that, "[w]here . . . an individual stopped for a minor traffic offense offers, at most, passive resistance and presents no threat or flight risk, abrupt application of physical force rather than continued verbal negotiating (which may include threats of force) is clearly unreasonable and excessive." 853 F.3d 738, 748 (5th Cir. 2017). In this case, Valencia was not stopped for a minor traffic offense. Rather, he was suspected of being involved in a bar fight and possibly armed. *See Robles*, 797

F. App'x at 828 (distinguishing *Hanks* "because the underlying crime was not a minor traffic offense but an act of violence"). Accordingly, *Hanks* does not clearly establish a Fourth Amendment violation in this context.

Valencia also includes citations to cases in which we have held that the use of force was unreasonable where the plaintiff "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command," *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012), or was "stopped for a minor traffic violation" and was not "suspected of a serious crime," *Deville*, 567 F.3d at 167. For the reasons stated above, these cases are also distinguishable.

Nor is this an "an obvious case," in which the *Graham* factors "can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). First, as discussed above, the record establishes that Davis had reason to suspect that Valencia had been involved in a serious offense.[6] Moreover, courts have consistently held that the use of force is "not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Salazar–Limon v. City of Hous.*, 826 F.3d 272, 278 (5th Cir. 2016) (quoting omitted). Accordingly, we have affirmed the use of even deadly force where the suspect reached toward his waist in such a way that the officer perceived "to be consistent with a suspect retrieving a weapon." *Id.* at 275; *see also Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) (finding use of force reasonable where officer had been told suspect had a gun and suspect moved

---

[6] Valencia contends that a "bar fight" is not a serious offense. However, Davis points out that, under Texas law, an aggravated assault occurs when the actor "causes serious bodily injury to another . . . or . . . uses or exhibits a deadly weapon during the commission of the assault." Tex. Penal Code § 22.02(a)(1)–(2). Accordingly, considering the "facts that were knowable" to Davis, he had reason to suspect Valencia had been involved in a serious offense. *Garza*, 943 F.3d at 745 (citations omitted).

a hand toward his side); *Anderson v. Russell*, 247 F.3d 125, 130–31 (4th Cir. 2001) (finding use of force reasonable where officer was informed suspect was armed, perceived a bulge near waistband, and suspect suddenly lowered his hands). We conclude that this is not an "obvious case" of excessive force such that the *Graham* factors can establish a violation "even without a body of relevant case law." *Brosseau*, 543 U.S. at 199.

Assuming *arguendo* that Davis's actions amounted to a constitutional violation, we find that Valencia failed to meet his burden of showing that such a violation was clearly established. Davis is thus entitled to qualified immunity.

### B. Expert Report

Valencia argues that the district court erred in excluding the expert testimony filed with his response to the motion for summary judgment. Valencia's expert, Craig R. Miller, a retired police officer and former Chief of Police for the Dallas Independent School District Police Department, opined that Davis's actions "were not reasonable, appropriate, or consistent with nationally accepted standards under these circumstances." The district court granted Davis's motion to strike this testimony "for the reasons argued therein and because the expert's testimony is irrelevant to the adjudication of the qualified immunity analysis in light of the comprehensive video footage entered into the record." Davis contends, *inter alia*, that Miller's report provides improper legal conclusions, is prejudicial and irrelevant, and offers conclusions that are unsupported by factual analysis.

"We review the trial court's evidentiary rulings for abuse of discretion." *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 739 (5th Cir. 2020) (citing *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 430 (5th Cir. 2014)). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of

the evidence." *United States v. Kinchen*, 729 F.3d 466, 470–71 (5th Cir. 2013) (citation omitted). "[E]ven if an abuse of discretion is found, we will only reverse and remand if the error affected the substantial rights of the complaining party." *Novick*, 946 F.3d at 739 (citing *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199, 202 (5th Cir. 2016)).

In his report, Miller offers two opinions. First, he states that the "use of force applied by Officer Davis against Mr. Valencia in this arrest situation was unreasonable and unnecessary." "Experts cannot 'render conclusions of law' or provide opinions on legal issues." *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020). "Reasonableness under the Fourth Amendment or Due Process Clause is a legal conclusion." *Id.* (citation omitted). We have thus affirmed the exclusion of expert reports where, as here, they opine that a defendant's use of force was "unnecessary and objectively unreasonable" based on "well-established law enforcement use of force training and standards." *Id.*[7]

Miller next opines that "Officer Davis was not in immediate harm or fear for his life." He bases this opinion in large part on the fact that Davis testified that he was aware Valencia did not have a gun in his hand when Davis charged him. However, courts generally do not require an officer to "wait until he sets eyes upon the weapon" before using even deadly force to protect himself. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001); *see also Salazar–Limon*, 826 F.3d at 279 n.6 ("[W]e have never required officers to wait until a defendant turns towards them, with weapon in hand, before

---

[7] Valencia attempts to rescue Miller's expert report by arguing that it analyzes Davis's "conduct as it related to the established standards of police conduct" rather than the Fourth Amendment. As detailed above, we have nonetheless affirmed the exclusion of expert reports that opine as to the reasonableness of force as compared to "well-established law enforcement use of force training and standards." *Renfroe*, 974 F.3d at 598.

applying deadly force to ensure their safety."). As we have previously stated, the fact that a suspect "was actually unarmed" is "irrelevant" if the officer reasonably believed that he was armed. *Reese v. Anderson*, 926 F.2d 494, 501 (5th Cir. 1991). Accordingly, to the extent Miller states that Davis was not in "fear for his life" because Valencia did not have a gun in his hand, the district court did not abuse its discretion by excluding his testimony. *See Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) ("[E]xpert testimony must be relevant . . . in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.").

We thus find that the district court did not abuse its discretion in excluding Valencia's expert report.

**IV.**

Based on the foregoing, we AFFIRM.